**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| PROFESSIONAL TENNIS PLAYERS ASSOCIATION and WINNERS ALLIANCE, INC., | Case No. 1:26-cv-7886 |
| Plaintiffs, | **JURY TRIAL DEMANDED** |
| v. | |
| WAJID MIR SYED, a/k/a WAJID MIR, | |
| Defendant. | |

**COMPLAINT**

Plaintiffs Professional Tennis Players Association and Winners Alliance, Inc., for their Complaint against Defendant Wajid Mir Syed, allege as follows:

**INTRODUCTION**

1. The Professional Tennis Players Association (the "PTPA") was founded to give professional tennis players an independent voice in a sport that pays them a fraction of the revenue they generate and has long denied them any real say in how the sport is run. The PTPA's founders include some of the most accomplished players in the game. Winners Alliance, Inc. was created to support the PTPA, endow its work, and advance that mission. Winners Alliance funds the PTPA's operations and provides it with administrative and operational support. Winners Alliance hired Defendant Wajid Mir Syed ("Mir") in 2022. In 2023, Winners Alliance CEO Ahmad Nassar, who then served as the PTPA's Executive Director, appointed him the PTPA's General Counsel and Executive Vice President for Player Engagement. As a condition of his employment, Mir signed a written agreement promising to safeguard his employer's confidential information and

1

never to disparage it. And as the PTPA's lawyer, he was entrusted with its most sensitive confidences and charged with protecting its governance.

2. Mir broke those promises and turned on the organizations he was paid to serve. Passed over for the PTPA's top job, and facing scrutiny of his own performance and conduct, Mir set out to take the PTPA for himself. Asked only to help identify respected players for the PTPA's governing Executive Committee to consider appointing to the Committee's open seats, he instead spent months recruiting a slate of his own, had them sign "appointment confirmation" forms that are inconsistent with the PTPA's Articles of Incorporation and its Bylaws (which do not authorize him or any other officer of the PTPA to appoint Executive Committee members), and then purported to declare these candidates, along with two sitting Committee members partial to him, the new Executive Committee.

3. Mir's goal in attempting to perpetrate this coup was to seize the PTPA's finances, its personnel, and above all its most consequential undertaking: a landmark federal antitrust lawsuit against the sport's governing bodies and Grand Slams, which he sought to control as leverage to secure funding and position for himself. Along the way, he publicly disparaged the PTPA and Winners Alliance and disclosed confidences that he had obtained as counsel. Everything Mir did, he did for his own benefit.

4. The PTPA's true leadership moved to remove Mir. On June 3, 2026, the PTPA's Executive Director Romain Rosenberg decided to terminate Mir for gross malfeasance and remove him as an officer of the Association—a decision within his authority under the Association's Bylaws and governing law—and a supermajority of the PTPA's duly serving Executive Committee agreed. PTPA co-founder and Executive Committee member Vasek Pospisil

communicated the decision to Mir on June 4, 2026, and Rosenberg instructed Winners Alliance to immediately cut off Mir's access to the PTPA's email account and other property.

5. Mir has refused to accept that he is gone. He continues to hold himself out as the PTPA's General Counsel and Executive Vice President. He retained an international law firm to send demands, in the PTPA's name, to the PTPA's real Executive Committee. He told the PTPA's antitrust counsel that he, not the PTPA's actual leadership, is in charge. He has disclosed and used privileged and confidential information he obtained as counsel for his own benefit. And as the Wimbledon Championships proceed, Mir is there, interacting with players, agents, and tennis officials and holding himself out as the PTPA's representative, while continuing to disparage it, its current and former staff and directors, and Winners Alliance.

6. Nor is Mir's timing accidental. He made his move as the antitrust case—the most important undertaking in the PTPA's history—approaches a pivotal stage and is at its most vulnerable to disruption. And on information and belief, Mir is communicating, directly or indirectly, with the PTPA's litigation adversary in that case about settlement. Every day that Mir is permitted to pose as the PTPA's General Counsel and Executive Vice President inflicts fresh and irreparable harm on the PTPA's governance, its ability to direct its own lawyers and litigation, the confidences it entrusted to him, and both Plaintiffs' reputations and relationships. Indeed, the antitrust defendants have already invoked the confusion Mir created to argue that the PTPA should be dismissed from that case altogether.

7. Acting through the committee he purported to install, Mir has caused a lawsuit to be filed in the PTPA's own name, in the Superior Court of the District of Columbia, against the PTPA's sitting Executive Committee members, its Executive Director, and Winners Alliance, seeking to enjoin the PTPA's actual leadership from acting as such. Plaintiffs thus bring this action

3

for a declaration that Mir holds no office and no authority to act or speak for the PTPA, for injunctive relief restraining his unauthorized conduct and his continuing breaches, and for damages. This action is also filed as a defensive action against the unwarranted attacks by Mir on the PTPA, his improper use of its name, and his illegal efforts to subvert the interests and principles of the PTPA and its real Executive Committee and leadership.

## PARTIES

8. Plaintiff Professional Tennis Players Association is a nonprofit corporation organized under the District of Columbia Nonprofit Corporation Act, D.C. Code § 29-401.01 et seq., with its principal place of business in McLean, Virginia.

9. Plaintiff Winners Alliance, Inc. is a corporation organized under the laws of Delaware, with its principal place of business in McLean, Virginia.

10. Defendant Wajid Mir Syed, also known as Wajid Mir, is a natural person domiciled in Illinois. He has resided in Chicago, Illinois since at least 2016, where he owns a home. At all relevant times until his termination, Mir served as General Counsel and Executive Vice President for Player Engagement of the PTPA, working remotely from his home in Chicago.

## JURISDICTION AND VENUE

11. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1). The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and the action is between citizens of different States.

12. Winners Alliance is a citizen of Delaware and Virginia. The PTPA is a citizen of the District of Columbia, its place of incorporation, and of Virginia, where it maintains its principal place of business. Mir is a citizen of Illinois. Complete diversity exists between Plaintiffs and Defendant.

4

13. The amount in controversy exceeds $75,000. Mir's conduct has caused and is causing Plaintiffs monetary damages well in excess of that amount, Plaintiffs seek to claw back more than $75,000 in compensation paid to Mir while he was acting as an unfaithful servant, the value of the rights Plaintiffs seek to protect through declaratory and injunctive relief likewise exceeds the $75,000 threshold, as do the attorneys' fees Plaintiffs have incurred and will incur and to which they are entitled under Mir's employee non-disclosure and non-disparagement agreement.

14. This Court has personal jurisdiction over Mir because he is a citizen of Illinois, and because a substantial part of the conduct giving rise to Plaintiffs' claims was directed and carried out by Mir from this District.

15. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Mir resides in this District, and under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.

### FACTUAL ALLEGATIONS

### A. The PTPA and Its Mission

16. The PTPA is a player-governed nonprofit corporation founded to advance the interests of professional tennis players and the betterment of the sport by improving players' economic and working conditions, increasing transparency and fairness in the sport's governance, and representing players in their common interests. It was founded in its current form in 2022 and incorporated in the District of Columbia in 2023.

17. The PTPA's most consequential undertaking is a federal antitrust action against the governing bodies of professional tennis and the Grand Slams, captioned *Pospisil v. ATP Tour, Inc.*, No. 1:25-cv-02207 (S.D.N.Y.) (the "Antitrust Action"). The Antitrust Action alleges, among other things, that the defendant tours and Grand Slams have unlawfully suppressed player compensation and restrained competition in the markets for professional tennis players' services. One defendant

has already settled and agreed to cooperate, with court approval in January 2026, and the case is at a pivotal early stage where additional settlements are a real possibility. The PTPA is represented in that action by Weil, Gotshal & Manges LLP. Decisions about how to prosecute the PTPA's claims in the Antitrust Action, and whether and on what terms to resolve them, belong to the PTPA's authorized leadership.

### B. Winners Alliance and Its Relationship with the PTPA

18. Winners Alliance is a for-profit company that exists to create and secure commercial opportunities for groups of professional athletes and to ensure they are fairly compensated for their talent. Since its founding in 2022, Winners Alliance has funded more than $15 million into the PTPA and has generated and distributed more than $25 million to athletes across professional sports, primarily in tennis. Winners Alliance follows this model across sports, building and supporting independent players' associations in multiple disciplines. The PTPA was among its founding partners, and as an early partner, the PTPA secured especially favorable terms for the organization and players it represents. Winners Alliance's multi-sport approach is a source of strength: it allows Winners Alliance to spread cost and risk, to carry lessons and leverage from one sport to another, and to sustain long-term support for each association, including through the critical, formative period when a players' body most needs backing and is least able to fund itself.

19. Winners Alliance is crucial to the PTPA's ability to fulfill its mission. The PTPA had been established to finally give professional tennis players a voice, but it lacked the full-time staff, operating infrastructure, and funding it needed to advocate forcefully on players' behalf. Winners Alliance was created to supply the funding and operational foundation the PTPA needed, and the PTPA's founders, Vasek Pospisil and Novak Djokovic, asked Nassar to serve as the PTPA's initial Executive Director to professionalize the association and provide scaffolding for its growth. That

was a deliberate, player-first choice, not a conflict, as Mir has wrongly contended in disparaging Winners Alliance and Nassar. Had the aim been to enrich Winners Alliance or Nassar, the simpler and far more lucrative course would have been to pursue commercial opportunities alone and leave players without a central advocate. Instead, Winners Alliance took on the cost and risk of building the players' association in a good-faith and long-term partnership.

20. Winners Alliance provides the PTPA with funding and administrative and operational services, including payroll processing and the administration of certain technology and social-media accounts. Far from a conflict, this arrangement is deliberate and reinforcing, part of a broader, by-design model in which Winners Alliance strengthens its partner independent players' associations across multiple sports, aligning each behind the same goal: a stronger, better-funded, and more independent voice for the players themselves. Winners Alliance has no role in the PTPA's internal governance and does not select the PTPA's leadership.

21. As the PTPA matured, and as had long been contemplated, its leadership was separated from Winners Alliance entirely: Nassar transitioned to Winners Alliance, and the Executive Committee appointed a new Executive Director. Mir's suggestion that Winners Alliance's support, or Nassar's early stewardship, was a conflict or a vehicle for anyone's self-enrichment is a revision of that history that he advances only now, and only because it serves his own purposes.

### C. The PTPA's Governance

22. Under the PTPA's Articles of Incorporation (the "Articles") and its Constitution and Bylaws (the "Bylaws"), the PTPA's Executive Committee is the chief governing body of the Association and serves as its board of directors for purposes of the District of Columbia Nonprofit Corporation Act. The Executive Committee is composed of player representatives.

23. The Articles, the Bylaws, and District of Columbia law prescribe how members of the Executive Committee may be appointed and removed. The Articles directly appointed three members, Vasek Pospisil, Novak Djokovic, and John Isner, each of whom, under the Articles, "shall serve as an Executive Committee member until" a successor is duly elected and qualified or until his earlier death, resignation, or removal. Ex. A (Articles), art. V. Djokovic and Isner have since resigned; Pospisil has not, and no successor has been duly elected and qualified, so Pospisil continues to serve.

24. All other members are elected to three-year terms, as provided in the Bylaws, and the Executive Committee may appoint members to fill a vacancy until the conclusion of a vacating member's term. Ex. A, art. V; Ex. B (Bylaws), art. IV, § 1(b)(iv)–(v); D.C. Code § 29-406.10(a). In addition to Pospisil, the current Executive Committee consists of Hubert Hurkacz, Ons Jabeur, Bethanie Mattek-Sands, Taylor Townsend, and Saisai Zheng. Mattek-Sands, Hurkacz, Jabeur, and Zheng were elected in 2023, and Townsend was appointed to fill a vacancy in 2024. Under D.C. Code § 29-406.05(d), a member whose term has expired continues to serve until a successor is duly elected, appointed, or designated and takes office, so Mattek-Sands, Hurkacz, Jabeur, Townsend, and Zheng also continue to serve even though the terms to which they were elected or appointed expired in early 2026. Four seats on the Executive Committee are currently vacant.

25. The PTPA's Executive Director is appointed by, and serves at the pleasure of, the Executive Committee. The Executive Director carries out the executive functions of the Association; is authorized to hire, fire, and compensate employees and to engage and direct the Association's attorneys and other professionals; and makes all decisions for the Association not expressly committed to the Executive Committee. Ex. B, art. IV, § 2(d)(v)–(vii). However, neither the Executive Director nor any other officer or employee of the PTPA has authority to appoint,

8

remove, or reconstitute the Executive Committee, powers expressly committed to the membership as a whole or, as applicable, to the Executive Committee itself. Ex. A, art. V; Ex. B, art. IV, § 1; D.C. Code § 29-406.10(a).

26. Ahmad Nassar served as the PTPA's initial Executive Director, beginning in 2022 and formalized in January 2023. In March 2026, Nassar transitioned away from that role to focus on Winners Alliance, and the Executive Committee appointed Romain Rosenberg as Executive Director.

### D. Mir's Employment and His Obligations to Plaintiffs

27. Winners Alliance hired Mir, an attorney and sports agent, in December 2022 to serve as its General Counsel and Executive Vice President. His offer letter, which he acknowledged and agreed to on December 9, 2022, states that his employment was at will. Ex. C. As compensation, Mir received a salary of $425,000, was eligible for a discretionary bonus, and was granted substantial equity options in Winners Alliance. *Id.*

28. As a condition of his employment, on December 6, 2022, Mir signed an Employee Obligations, Non-Disclosure and Proprietary Information Agreement with Winners Alliance (the "Agreement"). Among other things, the Agreement requires Mir, both during and after his employment, to hold the confidential or proprietary information of both Winners Alliance and the PTPA in the strictest confidence and not disclose or use it improperly or for unauthorized purposes. Ex. D (Agreement) §§ 1.1–1.4. It also provides that he will "not at any time make, publish, or communicate to any person or entity or in any public forum any defamatory or disparaging remarks, comments, or statements concerning the Company and the Company's products or services, including the Company's efforts to generate and maximize commercial opportunities consistent with the Company's purpose." *Id.* § 7. And it requires him to return all Company

property and confidential or proprietary information when his employment terminates, or at any time upon request. *Id.* § 6.

29. The Agreement provides that any threatened or actual violation of its terms by Mir constitutes immediate and irreparable injury, that such violations may be restrained by injunction and specific performance without bond, and that the Company is entitled to its costs and reasonable attorneys' fees if it prevails. *Id.* § 9. The Agreement's obligations survive the termination of Mir's employment. *Id.* § 12.4.

30. In mid-2023, Nassar appointed Mir to serve as the PTPA's General Counsel and Executive Vice President for Player Engagement, at the pleasure of the Executive Director. In those roles, Mir was the PTPA's senior lawyer and one of its senior executives, entrusted with the PTPA's confidences and charged with ensuring its proper governance.

31. As the PTPA's General Counsel, Mir owed the PTPA the duties a lawyer owes a client, including the duty to preserve the client's confidences, the duty of loyalty, and the duty not to use his position adversely to the client. As an officer and agent, he also owed the PTPA fiduciary duties of loyalty, including the duty not to act for his own benefit or for an adverse interest in matters connected with his work and the duty to refrain from conduct likely to damage its enterprise. The confidences, the governance responsibilities, and the access that Mir would later turn against the PTPA were entrusted to him for one reason: because he was its lawyer and agent.

### E. The Leadership Transition and the Strategic Reset

32. When the Executive Committee chose Rosenberg as Executive Director in March 2026, it passed over Mir, who had lobbied for the position, including—ironically, given his later claims regarding conflicts of interest—to a member of the Winners Alliance Board of Directors. Even

after the Committee chose Rosenberg, Mir refused to let go, proposing directly to Rosenberg that he share the role with Mir as "Co-Director."

33. Mir also knew that his job was in jeopardy. Nassar and members of the Executive Committee had repeatedly raised concerns with Mir's performance and his conduct dating back to 2023, including concerns with his oversight of governance issues and corporate formalities and that some of his former player clients might sue him for malfeasance. And the PTPA's leadership had recently discussed giving Mir a "renegotiated" role that would reduce his compensation to better align with his performance and the value he was bringing to the Association.

34. After Rosenberg became Executive Director, the PTPA undertook a deliberate effort to revitalize the organization and refocus it on delivering value to players, what Rosenberg called a "Strategic Reset." As part of that effort, the PTPA sought to help the Executive Committee fill open seats on the Committee with active, respected players.

35. Rosenberg asked Mir to help identify candidates for the Executive Committee to consider. After he identified two prominent players, Rosenberg suggested that Mir have the players provide written commitments to avoid them changing their minds.

**F. Mir's Attempt to Seize Control of the PTPA**

36. Rather than carry out the task he was given, Mir used it to try to seize control of the PTPA for himself.

37. Over several months, Mir and Anastasia Skavronskaia, a PTPA employee collaborating with him, recruited a slate of players and had them sign a one-page "Executive Committee Member Acknowledgment" form created by Mir. The form purported to "confirm" each player's "appointment" to the Executive Committee. Mir and Skavronskaia obtained signed "appointment confirmation" forms from players including Marco Trungelliti and Arina Rodionova, falsely

11

representing to them that they were being appointed to the Committee. Mir also obtained a signed form from a sitting member of the Executive Committee partial to him, Saisai Zheng, purporting thereby to appoint her to a "new" three-year term.[1]

38. The duly serving Executive Committee never seated any of Mir's additions to the Committee or ratified his purported appointments. Mir knew, or as the PTPA's General Counsel should have known, that neither he, nor the Executive Director, nor any other officer or employee may appoint members of the Executive Committee, and that a vacancy may be filled only by a majority vote of the Committee. Yet by his own sworn account, he purported to treat the "appointment confirmation" forms as effective in implementing his attempted coup. Ex. E (Decl. of Wajid Mir Syed (D.C. Super. Ct.)), ¶¶ 5–7, 10.

39. Mir's object was control. He sought to direct the PTPA's finances, its personnel, and its litigation, and to be recognized as its de facto leader. Control of the Antitrust Action was central to his plan. On information and belief, Mir sought to use that litigation, and any settlement of it, as leverage to secure funding for himself independent of Winners Alliance and to entrench his own position. He prioritized named plaintiffs from the Antitrust Action for his Executive Committee recruiting effort, such as Trungelliti and Zheng, for exactly that purpose.

---

[1] As will become clear, Mir did this so he could claim that the supermajority of Executive Committee members who had passed him over for the Executive Director position, Pospisil, Mattek-Sands, Hurkacz, and Jabeur, were no longer validly on the Committee because their terms had expired. But as Mir knew or should have known, the PTPA's Articles provide for Pospisil to serve until his successor is elected, Ex. A, art. V, meaning that Pospisil's term *cannot* have expired despite the three-year term limit in the bylaws, *see* D.C. Code § 29-402.06(b) (in the event of a conflict, articles of incorporation prevail over bylaws). Moreover, for all of the Executive Committee members, D.C. Code § 29-406.05(d) provides that a director whose term has expired "shall continue to serve until" a successor is duly "elected, appointed, or designated and . . . takes office." *See supra* ¶¶ 23–24.

40. While pursuing this scheme, Mir disparaged the PTPA, Winners Alliance, and Nassar to players, including to the very players he was recruiting to his slate. He told them, among other things, that Winners Alliance and Nassar were conflicted, were enriching themselves at the players' expense, and were not acting in the players' interests.

41. Mir was also willing to operate through concealment against his own client. Months earlier, Mir submitted, or directed another to submit on his behalf, an anonymous complaint against a PTPA contractor to the PTPA's public email account, and never disclosed to the PTPA, which he was then advising as its General Counsel, that he was the source of the complaint.

42. On information and belief, Mir also created, or caused to be created, fake social media accounts and used those accounts to disseminate false, misleading, and disparaging statements about the PTPA, Winners Alliance, and their respective leaderships.

**G.  Mir's Termination for Gross Malfeasance**

43. Mir's scheme came to a head at the end of May 2026. On the night of Sunday, May 31, 2026, the PTPA received a confidential demand letter (the existence and contents of which Mir has since disclosed and used for unauthorized purposes in violation of his duties both as an attorney and under the Agreement) from counsel for Anastasia Skavronskaia. The letter asserted an employment-related claim against the PTPA, Winners Alliance, and Rosenberg. Oddly, the letter referred to Rosenberg's opposition to Skavronskaia's "efforts as a member of the Leadership Team, and with current Executive Committee members, to timely recruit others to ensure robust leadership and direction of the association," and claimed that the Executive Committee was not "properly functioning" and that Rosenberg was "ultra vires."

44. Mir demanded that, instead of retaining outside counsel, he should be given sole control of investigating and responding to the letter. But Mir was also a witness to the events giving rise

to the purported claim, and Rosenberg determined that neither he nor Mir should direct the investigation. Rosenberg thus informed the Executive Committee of the demand letter and delegated to four of its members the power to retain independent outside counsel to investigate the allegations and respond to the demand.

45. Mir reacted by telephoning Rosenberg from a group call with two external PTPA player-ambassadors, falsely claiming that Rosenberg was trying to hire outside counsel friendly to him to investigate the demand letter's allegations to conceal his wrongdoing. Mir also warned that he knew things about Rosenberg and that "it would be a very bad look for" Rosenberg if the Executive Committee were to become aware of them. And Mir claimed that the Executive Committee was illegitimate, that certain of its player representatives' terms had expired, and that those players were no longer members of the Committee. As the PTPA's General Counsel responsible for its governance, Mir had never informed the Executive Committee that it was improperly constituted or that any of its members lacked authority to sit. He advanced those frivolous claims only when doing so became useful to his own bid for control.

46. At the same time, Mir went to the Executive Committee he was now claiming was illegitimate to seek Rosenberg's removal, telephoning one or more of its members to argue—based on the not-yet-investigated allegations from the demand letter—that Rosenberg was no longer fit for the role of Executive Director.

47. On June 3, one of the Executive Committee members whom Mir had contacted called Rosenberg and told him about what Mir was doing. By this point, Mir's intentions had become clear, and Rosenberg decided to terminate Mir for his gross malfeasance, a decision within Rosenberg's authority as Executive Director. Rosenberg then informed Pospisil, Hurkacz, Jabeur,

14

and Mattek-Sands that Mir was attempting to organize a coup and that as a result Rosenberg had decided to remove him.

48. Also on June 3, Pospisil called an urgent meeting of the Executive Committee to discuss Mir's termination, joined by Hurkacz, Jabeur, and Mattek-Sands. Townsend and Zheng were aware of the meeting but did not attend. All four attending members—a supermajority of the duly serving Executive Committee—agreed with Rosenberg's decision to terminate Mir. Pospisil, as co-founder of the PTPA, agreed to be the one to inform Mir, given his relationship with Mir and his status in the organization.

49. Before the decision could be conveyed, however, Mir learned that he was being terminated and decided to act. He convened his slate of false representatives, along with Townsend and Zheng, and gave them resolutions to sign purporting to remove Rosenberg as Executive Director, to "reaffirm" Mir's role, to provide that the Association's operations would from thenceforth be carried on by Mir and Skavronskaia under the new committee's oversight, and to "authorize" Mir to investigate the PTPA's relationship with Winners Alliance. In a single meeting, therefore, Mir used the false committee he had assembled to purport to depose the sitting Executive Director, entrench himself, and turn the organization against the funder on which it depends. But the meeting Mir convened was not a meeting of the Executive Committee. By Mir's own account, every player who "voted" at his fake meeting had been seated only by the appointment forms Mir created, Ex. E (Mir Decl.), ¶ 10, and Pospisil, Hurkacz, Jabeur, and Mattek-Sands were never even notified. At most, therefore, only two actual members could have attended or voted (if that), far short of a quorum or a majority of the six-member board.

50. On June 4, 2026, Pospisil notified Mir that his employment had been terminated and that he had been removed as General Counsel and Executive Vice President. Rosenberg instructed

15

Winners Alliance to cut off Mir's access to his PTPA email account and corporate credit card and to remove him from the Association's payroll. Whatever Mir purported to do at his own meeting, the PTPA had fired him. Those steps were taken consistent with applicable employment laws, including promptly providing Mir with his final paycheck and COBRA benefits, among other things. Since June 4, 2026, Mir has held no office or position with the PTPA and has had no authority to act or speak for it, and the PTPA has not authorized him to do so.

### H.  Mir's Refusal to Accept His Removal and His Continuing Misconduct

51. Although he holds no office and no authority, Mir refuses to step aside. He continues to hold himself out as the PTPA's General Counsel and as a person authorized to act and speak for it—as he does even in his sworn court filings. Ex. E (Mir Decl.), ¶ 1 (describing himself as "the General Counsel and Executive Vice President for Player Engagement" of the PTPA).

52. Upon information and belief, Mir retained the law firm Clifford Chance US LLP, which—purporting to act for the PTPA through Mir's false committee—sent a demand letter to four sitting members of the Executive Committee, asserting that Mir's termination was void and that the sitting members were not validly serving members of the Executive Committee. The letter also "directed" the sitting members to stop acting or holding themselves out as authorized to act for the PTPA or instruct its employees, counterparties, or counsel; and threatened them with liability under computer fraud and unauthorized access statutes if they continued to access or use the PTPA computer systems, email, or financial accounts.

53. Mir told the PTPA's antitrust counsel at Weil that he is in charge of the PTPA and that Weil should take direction from him. His competing claim of authority has impaired the PTPA's ability to instruct its counsel, to prosecute the Antitrust Action, and to evaluate any potential resolution of it.

54. Mir told Skavronskaia's employment counsel that he speaks for the PTPA, and he purported to retain Stella Riberti, a Clifford Chance lawyer in Italy, to represent the PTPA in discussions with Skavronskaia's counsel concerning her Washington, D.C.-governed employment dispute. Riberti also sits on the appellate body of the Italian Tennis Federation, an alleged co-conspirator in the Antitrust Action.

55. Mir has disclosed, and threatened to use, privileged and confidential information he obtained while serving as the PTPA's counsel, including the PTPA's antitrust litigation strategy, its business and commercial strategy, the existence and contents of the confidential employment-related demand letter described above, and the PTPA's posture toward settlement. The PTPA has not waived, and does not waive, any privilege or protection as to Mir.

56. Mir has continued to disparage the PTPA, Winners Alliance, and their current and former officers, in the United States and abroad. As the Wimbledon Championships proceed, Mir is present among players, agents, and tennis officials, holding himself out as the PTPA's representative and disparaging PTPA leadership and Winners Alliance.

57. Upon information and belief, ATP Chairman Andrea Gaudenzi recently informed members of the ATP's tournament council that the ATP was progressing towards a settlement of the Antitrust Action. However, the PTPA has had no recent settlement discussions with the ATP. Therefore, upon information and belief, Mir may be communicating, directly or indirectly, with the ATP about resolving a litigation in which Mir has no role.

### I. Irreparable Harm

58. Mir's continuing conduct is causing Plaintiffs immediate and irreparable harm for which there is no adequate remedy at law.

59. So long as Mir is permitted to hold himself out as the PTPA's General Counsel, third parties, including the PTPA's own counsel, opposing counsel, players, agents, and tennis officials, cannot know who speaks for the PTPA. That uncertainty paralyzes the PTPA's ability to direct its lawyers, to govern its affairs, and to prosecute and resolve the Antitrust Action on which the interests of its members depend, at a particularly sensitive and consequential moment in the action. These injuries to governance, to the attorney-client relationship, and to the conduct of pending litigation cannot be measured or repaired by money damages. Indeed, these injuries are no longer hypothetical. The antitrust defendants have already exploited the uncertainty Mir created, telling the court that "[i]t is not clear how or if plaintiffs' counsel can negotiate this conflict or discern from whom it must take direction on behalf of PTPA" and urging that the PTPA be dismissed from the case. (Antitrust Action, Dkt. 218, at 1, 3.)

60. Further, by casting the PTPA as an organization with two rival camps each claiming to lead it, Mir makes it appear too divided to govern itself, to represent the players who depend on it, or to prosecute the Antitrust Action on which their interests rest. That appearance erodes the credibility and authority on which the PTPA's advocacy and its standing to speak for players depend, and discourages players and other stakeholders from engaging with it. One player who expressed interest in serving as a player representative on the Executive Committee already has withdrawn because of the uncertainty created by Mir's actions. This loss of institutional standing and player confidence grows with each day Mir persists.

61. Mir's disclosure and threatened use of privileged and confidential information, once made, cannot be undone, and the loss of confidentiality is itself irreparable. Likewise, the damage that Mir's disparagement inflicts on Plaintiffs' goodwill and on their relationships with players, business partners, and the public is ongoing and not readily quantifiable.

62. The balance of equities and the public interest favor relief. An injunction would do no more than hold Mir to the obligations he undertook and prevent him from exercising an authority he does not possess, while the absence of relief would allow him to continue dismantling the governance and relationships of the organizations he was hired to serve.

## COUNT I
## Ultra Vires (D.C. Code § 29-403.04(b)(2))
*(Plaintiff PTPA)*

63. Plaintiffs reallege and incorporate each preceding paragraph as if fully set forth herein.

64. District of Columbia law authorizes a nonprofit corporation to bring a proceeding directly against a former officer, employee, or agent to challenge his power to act. D.C. Code § 29-403.04(b)(2).

65. Mir was an at-will employee, and his removal and termination were valid and effective under the Bylaws and applicable law. *See, e.g.*, D.C. Code § 29-406.43(b), (c) ("[A]n officer may be removed at any time with or without cause by: (1) The board of directors; (2) The officer who appointed the officer being removed, unless the board provides otherwise; or (3) Any other officer authorized by the articles, the bylaws, or the board."); Ex. B, art. IV, § 2(d)(v), (vii); Ex. C at 2.

66. Upon his removal and termination, Mir ceased to hold any office or other position at the PTPA, and any actual or apparent authority he had to act or speak for the PTPA terminated. As a former officer, employee, agent, and attorney, Mir has no power to act on the PTPA's behalf. His continuing acts, including holding himself out as the PTPA's General Counsel and Executive Vice President, directing counsel to act in the PTPA's name, instructing the PTPA's litigation counsel, and purporting to reconstitute the Executive Committee, are unauthorized and beyond the scope of any authority conferred on him.

67. The PTPA is entitled to a declaration, pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and Federal Rule of Civil Procedure 57, that Mir is no longer an officer,

employee, agent, or attorney of the PTPA, and that he has no authority to act, speak, or hold himself out as acting or speaking for or on behalf of the PTPA, and injunctive relief under Federal Rule of Civil Procedure 65 enjoining Mir from doing the same. Unless enjoined, Mir will continue to act ultra vires, to the continuing and irreparable injury of the PTPA. And a declaration is necessary and appropriate to resolve the controversy and to enable third parties to disregard Mir's assertions of authority.

68. An actual, present, and justiciable controversy exists between the PTPA and Mir concerning Mir's status and authority. The PTPA contends that Mir was validly terminated, and that he no longer holds any office or any authority to act or speak for the PTPA. Mir contends that his termination was void and that he remains the PTPA's General Counsel with authority to act and speak for it.

## COUNT II
### Breach of Fiduciary Duty (Attorney)
*(Plaintiff PTPA)*

69. Plaintiffs reallege and incorporate each preceding paragraph as if fully set forth herein.

70. As the PTPA's General Counsel, Mir served as the PTPA's attorney and owed it the fiduciary duties a lawyer owes a client. Those duties include the duty to comply with obligations concerning the client's confidences, to avoid impermissible conflicting interests, to deal honestly with the client, and not to employ advantages arising from the attorney-client relationship in a manner adverse to the client. *See* Restatement (Third) of the Law Governing Lawyers § 16. A lawyer must not use or disclose the client's confidential information adversely to the client, and that duty continues after the representation ends. See *id.* §§ 59, 60.

71. Upon his discharge, Mir also was required to cease acting as the PTPA's lawyer and to stop representing that he does so. *See* D.C. Rules of Prof'l Conduct R. 1.16(a)(3). He was, and remains, prohibited from revealing or using the PTPA's confidences. See *id.* R. 1.6.

72. Mir breached these duties, including by continuing to hold himself out as the PTPA's General Counsel after his discharge; by purporting to act and to direct other counsel to act in the PTPA's name; by interfering with the PTPA's relationship with its litigation counsel; by using his former position adversely to the PTPA in an effort to seize control of it and its litigation; and by disclosing and threatening to disclose privileged and confidential information he obtained as the PTPA's counsel.

73. As a direct and proximate result of Mir's breaches, the PTPA has suffered and will continue to suffer harm, including injury to its governance, its litigation, its confidences, and its reputation. The PTPA is entitled to injunctive and declaratory relief and to damages, including punitive damages, in an amount to be proven at trial. *See, e.g.*, Restatement (Third) of the Law Governing Lawyers §§ 49, 55.

**COUNT III**
**Breach of Fiduciary Duty (Officer and Agent)**
*(Plaintiff PTPA)*

74. Plaintiffs reallege and incorporate each preceding paragraph as if fully set forth herein.

75. As a senior officer and agent of the PTPA, Mir owed the PTPA fiduciary duties, including the duty to act loyally for his principal's benefit in all matters connected with the agency relationship; the duty not to deal with the principal as, or on behalf of, an adverse party; the duty not to use the principal's property or confidential information for his own purposes or those of a third party; and the duty to refrain from conduct likely to damage the principal's enterprise. *See, e.g.*, Restatement (Third) of Agency §§ 8.01, 8.03, 8.05, 8.10.

76. Mir breached these duties, including by secretly working to seize control of the PTPA for himself; by purporting to install a slate of representatives loyal to him and to depose the sitting leadership; by disparaging the PTPA and its leadership to players; by disclosing and threatening

to disclose confidential information; and by retaining and refusing to return the property of his principal.

77. Mir acted disloyally, in his own interest and adversely to the PTPA, and engaged in conduct he knew was likely to damage the PTPA's enterprise. His conduct was willful, malicious, and in conscious disregard of the PTPA's rights.

78. As a direct and proximate result of Mir's breaches, the PTPA has suffered and will continue to suffer harm in an amount to be proven at trial. The PTPA is entitled to damages, including punitive damages, and to injunctive relief.

## COUNT IV
### Breach of the Duty of Loyalty (Unfaithful Servant)
*(Plaintiff PTPA)*

79. Plaintiffs reallege and incorporate each preceding paragraph as if fully set forth herein.

80. Mir was employed and compensated by the PTPA. As an employee and agent, Mir owed the PTPA an undivided and unselfish duty of loyalty, and was required to act solely for the PTPA's benefit in all matters within the scope of his employment and to avoid any conflict between his duties and his own self-interest.

81. Mir breached his duty of loyalty while employed and compensated by the PTPA. Among other things, he secretly worked to seize control of the PTPA for himself; solicited players to join a rival slate and purported to install them on the Executive Committee while declaring the sitting Committee illegitimate; misused confidential information he obtained in the course of his employment; and disparaged the PTPA to players. This conduct exceeded any privilege to prepare for future endeavors and constituted active and direct disloyalty during his employment.

82. Throughout the period of his disloyalty, which began at least several months before his termination and, upon information and belief, dates back much further, Mir continued to be

22

employed and to receive compensation paid by the PTPA for his service, including salary and bonus compensation.

83. Under District of Columbia law, an employee who breaches the duty of loyalty is entitled to no compensation for the period of his disloyalty and must forfeit the compensation paid to him during that period. To obtain forfeiture of that compensation, the PTPA need not prove that Mir's breach caused it injury; the breach itself requires forfeiture.

84. As a result of Mir's breach of his duty of loyalty, the PTPA is entitled to the forfeiture and return of all compensation, including salary and bonuses, paid to Mir during the period of his disloyalty; to disgorgement of any gains Mir obtained through his disloyalty; and to any additional damages proximately caused by his breach, in amounts to be proven at trial.

## COUNT V
### Breach of Contract
*(Plaintiffs PTPA and Winners Alliance)*

85. Plaintiffs reallege and incorporate each preceding paragraph as if fully set forth herein.

86. The Agreement is a valid and binding contract between Winners Alliance and Mir, supported by consideration. Winners Alliance performed its obligations under the Agreement. The PTPA is a third-party beneficiary of the Agreement.

87. The Agreement's confidentiality and non-disparagement obligations survive the termination of Mir's employment. Ex. D, § 12.4. Its confidentiality obligations run to the benefit of both Winners Alliance and the PTPA, and its non-disparagement obligations run to the benefit of Winners Alliance. Ex. D, §§ 1.1, 1.3, 7. In Section 7, Mir covenanted that he would "not at any time make, publish, or communicate to any person or entity or in any public forum any defamatory or disparaging remarks, comments, or statements concerning the Company and the Company's products or services." Ex. D, § 7. In Section 1, Mir agreed to hold the confidential or proprietary information of both Winners Alliance and the PTPA in the strictest confidence, both during and

23

after his employment, and not disclose or use it improperly or for unauthorized purposes. Ex. D, § 1.

88. Mir breached the Agreement, including by disparaging Winners Alliance, its chief executive, and its services to players, tennis officials, and others, in the United States and abroad, and by disclosing or using, and threatening to disclose or use, Winners Alliance's and the PTPA's confidential and proprietary information improperly and without authorization, and for purposes adverse to them.

89. The Agreement provides that any threatened or actual violation constitutes immediate and irreparable injury and entitles Winners Alliance to injunctive relief and specific performance without bond, in addition to damages, and to its costs and reasonable attorneys' fees if it prevails. Winners Alliance has been and will continue to be irreparably harmed by Mir's breaches and is entitled to injunctive relief, damages in an amount to be proven at trial, and its costs and attorneys' fees.

**COUNT VI**
**Conversion**
*(Plaintiffs PTPA and Winners Alliance)*

90. Plaintiffs reallege and incorporate each preceding paragraph as if fully set forth herein.

91. Plaintiffs have an immediate and superior right to possession of their property, including their files, records, documents, and data that came into Mir's possession in the course of his employment.

92. Following his termination, Mir was obligated to return all such property to Plaintiffs. Instead, Mir has wrongfully retained Plaintiffs' files, records, documents, and data, and has assumed unauthorized control and dominion over them, in defiance of Plaintiffs' rights.

24

**93.** Plaintiffs have been damaged by Mir's wrongful retention of their property and are entitled to declaratory relief, an order requiring the return of that property, and damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendant Wajid Mir Syed and grant the following relief:

A. A declaration that Mir is no longer an officer, employee, agent, or attorney of the PTPA and has no authority to act, speak, or hold himself out as acting or speaking for or on behalf of the PTPA;

B. Preliminary and permanent injunctive relief restraining Mir from holding himself out as an officer, agent, or attorney of the PTPA (including as its General Counsel); from purporting to act or speak for the PTPA or to direct any person (including outside counsel) to act in its name; from communicating with or directing the PTPA's counsel, or otherwise purporting to act for the PTPA with or before third parties; from interfering with the PTPA's relationships with its counsel or with third parties; from disclosing or using Plaintiffs' privileged, confidential, or proprietary information; and from disparaging Winners Alliance in violation of the Agreement; and requiring Mir to return all of Plaintiffs' property in his possession, custody, or control;

C. Damages in an amount to be proven at trial;

D. Punitive and exemplary damages;

E. Costs and reasonable attorneys' fees as provided by the Agreement, and such other costs and fees as may be allowed by law;

F. Pre-judgment and post-judgment interest as allowed by law; and

G. Such other and further relief as the Court deems just and proper.

25

## JURY DEMAND

Plaintiffs demand a trial by jury on all claims so triable.

Dated: July 6, 2026

Respectfully submitted,

*/s/ Daniel D. Birk*
Nathan P. Eimer
Daniel D. Birk
Gregory M. Schweizer
Mila B. Rusafova
EIMER STAHL LLP
224 S. Michigan Ave. Suite 1100
Chicago, IL 60604
(312) 660-7600
neimer@eimerstahl.com
dbirk@eimerstahl.com
gschweizer@eimerstahl.com
mrusafova@eimerstahl.com

*Attorneys for Plaintiffs Professional Tennis
Players Association and Winners Alliance, Inc.*